## MORRIS E. CASPERSON AND ANOTHER v. BOARD OF REGENTS OF UNIVERSITY OF MINNESOTA AND ANOTHER.

137 N. W. (2d) 194.

September 3, 1965—Nos. 39,420, 39,502.

*Mackall, Crounse, Moore, Helmey & Holmes, Clay R. Moore,* and *Frank J. Collins,* for appellants.

*Faegre & Benson, Wright W. Brooks, Charles B. Blackmar,* and *Swanson, Midgley, Jones, Blackmar & Eager,* for respondent association.

NELSON, JUSTICE.

These are two appeals from orders quashing and setting aside service of process upon the National Collegiate Athletic Association (hereinafter referred to as NCAA). The only issue before this court is whether the trial court erred in quashing service of process upon NCAA.

The action was brought by Morris E. Casperson as a taxpayer and by Fifth District American Legion All-Star Corporation (hereinafter referred to as All-Star Corporation), a nonprofit Minnesota corporation organized for the purpose, among others, of sponsoring an annual all-

star high school football game between selected squads of high school graduates. The participants in these games over the years were high school graduates who had not yet formally matriculated at any college or university. The games were held in Minneapolis annually from 1952 to 1960 and were popularly known as the North-South All-Star Football Game.

In January 1961 the NCAA at its annual convention at Pittsburgh, Pennsylvania, adopted Article III, Section 10(b), of its constitution. At the NCAA convention the following year in Chicago, Illinois, this section was amended to its present form, which reads:

"He [a student-athlete] shall be denied his first year of varsity athletic competition if, following his graduation from high school and before his enrollment in college, he was a member of a squad which engaged in any all-star football or basketball contest which was not specifically approved by the appropriate state high school athletic association or, if interstate, by the National Federation of State High School Athletic Associations or all of the state high school athletic associations involved; the Council of this Association may designate a committee to act in place of any state association which declines to assume the jurisdiction described in this paragraph."

All-Star Corporation sought approval from the Minnesota State High School League for its annual all-star football game to be played during the 1961 season. However, the League declined to approve or disapprove, claiming it had no control over the situation. The All-Star Corporation thereafter sought approval of the game from NCAA, but NCAA refused approval and the game has not been played since.

This action was brought to have Article III, Section 10(b), of the NCAA constitution declared void as violative of the due process and equal protection provisions of the United States and Minnesota Constitutions and to enjoin its enforcement.

The NCAA is a voluntary, unincorporated association of some 536 public and private colleges and universities throughout the United States. Headquarters are located in Kansas City, Missouri. Generally speaking, its purpose is to supervise and regulate intercollegiate athletics through-

out the states where intercollegiate athletics are scheduled. The University of Minnesota, which is also named as a defendant, has been a member in good standing of the NCAA since 1906.

Article II, Section 2, of the NCAA constitution is of particular significance with regard to the purposes of the association. It provides:

"Fundamental Policy. It is the fundamental policy of this Association that legislation governing the conduct of intercollegiate athletic programs of member institutions shall apply to basic athletic issues such as admissions, financial aid, eligibility and recruiting; that the member institutions shall be obligated to apply and enforce this legislation, and the enforcement program of the Association shall be applied to an institution when it fails to fulfill this obligation."

It is clear, therefore, that the University of Minnesota is obligated to enforce Article III, Section 10(b).

Article IV, Section 2, of the constitution of NCAA provides as follows:

"Conditions and Obligations of Membership. The members of this Association severally agree: (1) to administer their athletic programs in accord with the Constitution, the By-Laws and other legislation of the Association; (2) to schedule intercollegiate contests only with institutions which conduct their athletic programs in conformity with such principles; (3) to observe directions of the Council made pursuant to the provisions of Section 6 of this Article or by the annual Convention, to refrain from athletic competition with designated institutions; * * *."

It is plain, therefore, that NCAA members may schedule intercollegiate contests only with those institutions which conduct their athletic programs in conformity with principles outlined by the association. It also follows that NCAA members are forbidden to schedule athletic contests with schools which have been expelled from NCAA for not conducting their athletic programs in conformance with NCAA principles. We think it clear that should the member colleges and universities of this state choose not to enforce the resolution in issue, each and all would be foreclosed from Big Ten and other similar engagements and also from NCAA-sponsored championship events which, in effect, would mean a

withdrawal from the "sports scene" over which the NCAA exercises control.

Plaintiffs, in seeking jurisdiction, served the NCAA by filing copies of the summons and complaint with the secretary of state under Minn. St. 540.152, which, so far as pertinent, provides that the transaction of any acts or activities within the State of Minnesota by any member of any association having members without the state on behalf of such association shall be deemed an appointment of the secretary of state to be the attorney of such association upon whom may be served all legal processes in any action involving said association growing out of such acts or activities within the state resulting in damage or loss to person or property. The district court quashed the service on February 5, 1964. Plaintiffs thereafter also served the summons and complaint upon the Board of Regents of the University of Minnesota as agents of the NCAA. A motion to quash this service was also granted on April 21, 1964.

It is clear that the statute does not require, as the trial court apparently felt, that there be an agency relationship between the University of Minnesota and the NCAA. It is enough, as we see it, to confer jurisdiction if the University of Minnesota is a member of the NCAA and had some part in any transaction, act, or activity on behalf of the NCAA out of which this action arose.

As a further basis for substituted service on NCAA under § 540.152, plaintiffs point to activities of NCAA itself within Minnesota and activities of the University of Minnesota on behalf of the NCAA. NCAA has sponsored such championship events in Minnesota as baseball playoffs, basketball finals, hockey championships, and track and field championships. Every football game that is played in Memorial Stadium at the University of Minnesota is played according to the rules of the game developed by NCAA. The University of Minnesota pays membership dues to the NCAA and keeps records of athletic events which are sponsored by the NCAA and submits these to the NCAA. In addition, live telecasts of football games involving the University of Minnesota are conducted under the so-called NCAA Football Television Plan.

Perhaps it may be said that NCAA's officers or committees engaged in no acts or activities relative to the pertinent resolution in this state.

The trial court in its memorandum indicates that the University of Minnesota adopted the resolution and agreed to give its provisions effect. If this is so, then the pivotal question arises: Did the University of Minnesota adopt the resolution and agree to enforce it on behalf of the NCAA? The trial court felt that the university acted for itself only and not on behalf of the NCAA. There are, however, some practical aspects of this situation which cannot be lost sight of. According to an affidavit of plaintiffs' counsel, the University of Minnesota voted against the adoption of this resolution at the NCAA convention in Pittsburgh in 1961. In spite of that vote the resolution was enacted and became binding on the University of Minnesota as a member of the NCAA. If the university did not give effect to the resolution, it would be expelled from the NCAA pursuant to its constitution, bylaws, and resolutions. This would mean dropping out of the Big Ten in football and other sports. Under these circumstances it is most difficult to say or to contend that the University of Minnesota was acting only on behalf of itself when it adopted the resolution as promulgated by the NCAA. But if it was not acting on behalf of itself, it must have been acting on behalf of NCAA as one of its many members. If that is true then NCAA is subject to jurisdiction under § 540.152.

In Brooks v. International Brotherhood of Boilermakers, 262 Minn. 253, 114 N. W. (2d) 647, this court held substituted service of process on a foreign labor union was effective under § 540.152 when the union had performed acts, business, or activities in Minnesota which might have resulted in damage to plaintiff. We further held that it is not necessary that the cause of action itself arise in Minnesota when it is connected to a large number of related activities in Minnesota.

After deciding in the Brooks case that the substituted service there was valid, this court then turned to the question whether the statute as so construed was constitutional. The observation was made that the question is essentially the same as the one which has so often arisen regarding Minn. St. 303.13, subd. 1(3), which relates to substituted service on foreign corporations. We think now, as we did in the Brooks case, that the guiding principle was laid down in International Shoe Co. v.

Washington, 326 U. S. 310, 316, 66 S. Ct. 154, 158, 90 L. ed. 95, 102, 161 A. L. R. 1057, 1061, as follows:

"* * * [D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

Thus, notions of "consent," "doing business," and "presence" were laid to rest and a test of "minimum contacts" was substituted. The record in the instant case would indicate that NCAA has a broad pattern of varied activities reaching into Minnesota.

As already noted, in the Brooks case this court held that our courts have jurisdiction in cases where the alleged tortious activity occurred in another state, if damage resulted in Minnesota. See, Atkins v. Jones & Laughlin Steel Corp. 258 Minn. 571, 104 N. W. (2d) 888; Adamek v. Michigan Door Co. 260 Minn. 54, 108 N. W. (2d) 607. We think, under this rule, that where, as here, plaintiffs are suing on a cause of action closely tied up with harm resulting from defendant's many and varied activities reaching into this state jurisdiction exists to hear the suit. This is especially true where the state has a strong interest in regulating the activities in which defendant may be engaged. As in the Brooks case, it appears that the State of Minnesota has a manifest interest in the freedom, independence, and livelihood of its citizens and in protecting them from outside control or wrongful action of a nonresident association having members both within and without the state and having activities both within and without the state which may affect or involve both citizens and members within this state. See, Gray v. Building Trades Council, 91 Minn. 171, 182, 97 N. W. 663, 667, 1118, 63 L. R. A. 753, 759; and Carnes v. St. Paul Union Stockyards Co. 164 Minn. 457, 205 N. W. 630, 206 N. W. 396. An examination of the foregoing cases can leave little doubt that the enactment of § 540.152 indicates concern of our legislature with the area under consideration. Clearly, NCAA had a great number of contacts within Minnesota including contacts of a beneficial nature in addition to those which interfered with and allegedly caused in-

jury to All-Star Corporation. In addition jurisdiction may, under the circumstances, constitutionally be based upon the actions of the members of the association within the state as agents for the parent body.

In Perkins v. Benguet Consol. Min. Co. 342 U. S. 437, 444, 72 S. Ct. 413, 418, 96 L. ed. 485, 492, the United States Supreme Court after referring to certain decisions and particularly to International Shoe Co. v. Washington, *supra,* said:

"Today if an authorized representative of a foreign corporation be physically present in the state of the forum and be there engaged in activities appropriate to accepting service or receiving notice on its behalf, we recognize that there is no unfairness in subjecting that corporation to the jurisdiction of the courts of that state through such service of process upon that representative. This has been squarely held to be so in a proceeding *in personam* against such a corporation, at least in relation to a cause of action arising out of the corporation's activities within the state of the forum."

In measuring contact it appears that the United States Supreme Court's major considerations have been the state's relationship to a nonresident through his activities within the state. International Shoe Co. v. Washington, *supra;* Perkins v. Benguet Consol. Min. Co. *supra.* Such activity may serve as the basis of jurisdiction even though the matter in controversy does not arise out of it. The United States Supreme Court so held in the Perkins case when it said in its syllabus (342 U. S. 437):

"As a matter of federal due process, the business done by the corporation in Ohio was sufficiently substantial and of such a nature as to *permit* Ohio to entertain the cause of action against it, though the cause of action arose from activities entirely distinct from its activities in Ohio."

Clearly, an analogy can be drawn between the Brooks case and the instant case. In both cases we have an attempted service upon an association which is located without the state. In the Brooks case we had the local imposing the act which caused the damage. In the case at bar the out-of-state defendant, NCAA, initiated the act which resulted in the alleged damage to All-Star Corporation. It would appear that the out-of-

state defendant, NCAA, actually has a greater influence on plaintiffs than did the parent international union in the Brooks case.

The essence of the issue at the constitutional level is one of general fairness. The question is whether the operations of NCAA establish sufficient contacts or ties with the state of the forum to make the service reasonable and just, according to our traditional concept of fair play and substantial justice. We think it reasonable to conclude that the local association memberships held by collegiate institutions within this state coupled with NCAA's several activities within this state are of sufficient import to satisfy the requirements of these traditional concepts of fair play.

By agreement of counsel the trial court did not rule upon the motion to dismiss the complaint for failure to state an actionable claim but held that issue for later determination. We do not, by anything that has been said in reaching the foregoing conclusion on the issues of service of process, express or intend to express any views upon the merits of the controversy.

Both orders appealed from, quashing service upon defendant NCAA, are reversed.

Reversed.